*715 OPINION OF THE COURT
Jeffrey S. Sunshine, J.
In this postjudgment application the plaintiff moves by way of order to show cause for a termination of all orders of support for the infant issues of the marriage including the elimination of maintenance payments because of the “defendant’s intentional interference with visitation, and by reason of the defendant’s wilful and intentional alienation of the children from the plaintiff,” and, in the alternative, asks that the court enforce the terms and conditions of the visitation schedule.
The defendant cross-moves by way of notice of motion for counsel fees in the amount of $2,500 incurred by the defendant in answering the motion. The court determined that an evidentiary hearing was necessary in order to ascertain whether or not the plaintiff had met his burden for the elimination of the obligation for both child support and maintenance. It should be noted that while the father’s order to show cause referred to both children, only the daughter was the primary focus during the hearing.
The parties had been previously married for 26 years. The husband is a New York City police detective who was president of a fraternal New York City Police Department organization, the mother a homemaker although the husband has claimed she is employed outside of the home.
A judgment of divorce was entered into in this matter on October 21, 2004, based upon a stipulation of settlement and inquest taken thereafter on March 19, 2004, entered into in open court with both parties represented by counsel and the child having been represented by Francine Shiraga, a law guardian. The parties have two children, a son born in July of 1986, and a daughter born in September of 1993. According to the judgment of divorce, the defendant mother has sole residential custody of the children. The judgment of divorce provides that:
“pursuant to the parties’ Stipulation, the parties have agreed to work with a family therapist to facilitate visitation between the Plaintiff and the child [name omitted by court] working towards a final visitation schedule as follows:
“a. Alternate weekends from Saturday evening approximately 7:00 p.m. until Tuesday morning, at which time the Plaintiff shall take the child to school;
“b. During the weeks that Plaintiff does not have *716 the child for the weekend the Plaintiff shall pick the child up from the Defendant’s home and take her to school on Monday mornings, pick her up after school and return her to the Defendant’s home between the hours of 7:00 p.m. and 7:30 p.m. that evening; “c. Wednesday evenings after school until between 7:00 p.m. and 7:30 p.m. for a dinner visit;
“d. Three weeks vacation during the summer months, with no more than two (2) weeks consecutive, with the Plaintiff to notify the Defendant of said weeks by May 31st of each year; and
“e. The parties shall split the child’s winter break, winter intercession and Spring break time equally, with one party to have the first half of the week and the other to have the last half of the week, to be agreed upon between the parties; and it is further
“ORDERED AND ADJUDGED that pursuant to the parties’ Stipulation that while working with the therapist towards the final visitation schedule the Plaintiff shall have the following interim visitation with the child:
“a. Every Sunday from 9:00 a.m. to 7:00 p.m. with pick up and drop off to be from and at the Defendant’s home;
“b. The Plaintiff shall pick the child up from the Defendant’s home and take her to school on Monday mornings, pick her up after school and return her to the Defendant’s home between the hours of 7:00 p.m. and 7:30 p.m. that evening;
“c. One week night per week for a dinner visit with the parties to agree upon which night at the beginning of each week; and
“d. Either Friday or Saturday night of each week as the parties can agree; and it is further
“ORDERED AND ADJUDGED that pursuant to the parties’ Stipulation, regarding holiday visitation: Defendant shall always have Easter Sunday, Christmas and Christmas Eve, the plaintiff shall always have Rosh Hashanah and the parties shall alternate the first and second nights of Passover. In addition, the parties shall have the child on Mother’s Day and Father’s Day and mother’s birthday and father’s birthday respectively, and shall alternate the child’s birthday with Plaintiff to have [the daughter] on *717 her birthday this year. The parties shall also alternate the legal holidays beginning with Memorial Day, 2004, with the Defendant to have the child on said day.”
The stipulation of settlement also provided that the plaintiff was to pay to the defendant as and for child support the sum of $1,900 per month based upon the Child Support Standards Act, together with a payment of maintenance for a period of 12 years ($1,650 a month for six years, and then for years seven through nine $1,350 per month, and for years 10 through 12 $1,200 per month). The payment of maintenance to be considered income to the wife and deductible to the husband for purposes of taxes.
Postjudgment, this court by order dated December 22, 2004 reappointed Francine Shiraga as the law guardian to represent the infant daughter.
In the underlying stipulation of settlement the parties agreed that the child would continue to work with a Dr. Meyers who had been assisting the parties and child in providing therapeutic services. In accordance with the terms and conditions of the stipulation, the parties had agreed that “visitation with the child shall be in accordance with the recommendations of Dr. Meyers which shall be as follows, which we expect will be within a month and a month and a half.”
After the stipulation was placed on the record, the following colloquy took place:
“mr mainiero: Just one thing, your Honor, with respect to the alternate weekend visits, it’s anticipated that that’s going to happen this spring, midspring, and the parties will work with Dr. Meyers with respect to exactly when that’s going to start commencing.
“ms. avery: That’s correct, your Honor.
“the court: In any event, it will commence no later than — off the record. (Discussion held off the record.)
“mr mainiero: By Memorial Day, your Honor.
“the court: Thank you.”
The court thereafter commented and inquired as to how the child had been doing, given the fact that the child had a history of difficulty in going to school and there had been tremendous tension between the parents. The law guardian, on behalf of her client, indicated that her client was seeing Dr. Meyers, that the parents were visiting with Dr. Meyers and that the child had *718 been doing well. Thereafter, the court sealed the reports and letters of Dr. Aronson, the neutral forensic evaluator, without objection.
This application has been brought after the culmination of numerous events postjudgment which clearly indicate to the court that notwithstanding their “joint custody agreement” these parties are unable to cooperate and that this child has been placed in the middle of these parties. She has, to a certain extent, taken on the role of being the protector of the mother. As a result of the in camera interview and the testimony of the parties, this court believes that she herself is part and parcel of the postdivorce discord between the parties. In listening to the child, the court recognizes the child and mother utilize the sáme words, phrases, tones and expressions when referring to the father.
This court was also able to observe the behavior patterns of this father. His outbursts, his inability to control his temper, his veiled attempts to control his anger and frustration toward his ex-wife, her lawyer and, at times, even his own lawyer, result in insurmountable tension between the parties which will not allow this family to function in a joint custodial relationship in a postdivorce world. The mother, manipulative, lacks an ability to fully comprehend how her explosive behavior and constant need to involve their daughter in her disputes with her ex-husband does not help this child.
A series of events which have been testified to by the parties and which the court has heard from the daughter, leads this court to believe that parenting of this child includes this child taking on a role which in effect has empowered her to be the caretaker for a mother who is unable to take care of the child in an appropriate manner by setting limits and rules and, at the same time, protect that mother from a father with an outwardly explosive and frightening temper and inability to control himself.
It is significant that neither party called as a witness the therapist who had been working with the parties and the child, Dr. Meyers.
This court has witnessed this father’s outbursts as he sat next to his lawyer as well as on the witness stand. The court understands the basis of his frustration and recognizes that he himself does not understand how his personality and the way that he deals with situations have influenced both his ex-wife, his children and even the court. His view that the child is the *719 subject of manipulation and therefore he must take charge is one which clearly has led to a conflict between the child and him which has reached both dangerous and inappropriate proportions. That conflict did not arise in the postjudgment period of time but obviously arose a long time ago and is probably, to a certain extent, rooted in the very tumultuous if not violent relationship that this father had previously with the older son. This relationship has (to the credit of the father and son) recently been repaired and fortunately they have now entered a stage of cooperation and apparently mutual respect.[1]
The testimony herein reveals that the child has based her relationship with her father on what he is going to purchase for her during the periods of visitation. She is reluctant to spend overnight periods with him, is apparently bored during those periods of visitation, and is clearly not encouraged by the mother’s actions, words and continued involvement of the child as an active participant and collaborator with the mother. The mother’s testimony that she wants the child to see the father lacks credibility when she herself, apparently in front of the child, disparages the father.
It is clear that the child is afraid of the father. It is also clear that the father engages in outbursts and conduct which leave the child to believe the mother’s versions of events which have transpired in the past related to the father’s explosive behavior.
The mother though is not blameless. She engages in shouting and volatile outbursts. She does not foster or encourage visitation between the child and the father and involves the child in the most intimate details of the parent’s arguments, finances, and the divorce, as well as the discord between the father, the son and the mother. This combination of conduct by both parties leaves this child placed in a position where she clearly views herself as disloyal to the mother if she visits her father and leads the father to the increased frustration that because the child does not visit with him, and that he is expending which he considers to be exorbitant sums of money on support, he should not have to pay for support because his child does not visit with him. The child constantly seeks to end visitation early or avoid visitation with the mother’s tacit consent.
In the stipulation of settlement and judgment, the ultimate determination as to when overnight visitation would commence *720 on an overnight basis was left to the parents after consultation with Dr. Meyers. The court, in its allocution though, made it clear that there had to be some fixed date for the visitation to start and also, as stated on prior occasions, that the ultimate decisionmaker in a matrimonial action or custody dispute is not the expert but the court.
A series of “events” occurred between the father and child which culminated in what can only be described as an erratic, high-speed drive through parts of Brooklyn, with the child making numerous phone calls to individuals asking to be let out of the car, the father refusing to allow the child to leave the car in the middle of traffic and proceeding to take the child on a venture through Brooklyn and onto the Belt Parkway. These events included physical restraint of the child, the child placing herself in an endangered position of attempting to run out of a car, the involvement of the mother by calling the Internal Affairs Division of the New York City Police Department, and the involvement of the New York City Police Department headquarters duty captains, the grandmother, Dr. Meyers and the law guardian. This leads this court to believe that this family is on a collision course with this child, if both parents do not take affirmative steps to learn how to deal with each other (as it relates to the children) and to learn how to deal with this child, and that this child will suffer increased harm in the years to come without immediate intervention. Her various undiagnosed ailments and absences and latenesses to school on a consistent basis are of concern and present the danger of larger problems on the horizon if the dysfunctional relationships in this family do not resolve.
The father is apparently a well-known and extremely successful New York City police detective and president of a fraternal organization of police; the mother is a homemaker who clearly has been involved in every detail of this child’s rearing as well as this child’s progress or lack thereof. The child has an inability to get to school on time and at one period of time during the course of the postjudgment litigation had numerous absences and was late for school over 20 times. Notwithstanding that she is an honor roll student, there is no excuse for such conduct. There is clearly no excuse for a child to be late for school consistently, barring some emergency. The father, concerned about the child staying out late, has taken to passing by the house looking for the mother’s car, and looking at a place the mother frequents, at which he claims she works, and at which she claims she visits friends.
*721 The mother selling the former marital residence and moving with the child, but not notifying the husband of her intent to move, has created an additional strain and tension which the court recognizes certainly was blown out of proportion. The father must recognize that he has absolutely no control over where the mother moves locally. She is his ex-wife, not his present wife. Similarly, the mother must recognize that commonsense communication should allow the father to know where the child will be living in the future. Secrecy, confusion, frustration and anger are the hallmark of the mother’s move from the former marital residence. Similarly, visitation had become strained, filled with anxiety, inconsistent and lacking coordination, with individuals present who have no business being involved during the period of time that the father is with the child.
This father exercised poor judgment in bringing other individuals into visitation situations where the child herself is frightened, concerned and looks upon visitation with him as a form of disloyalty. Similarly, both parties, by allowing a child to be placed in a position by buying expensive electronic devices as a quid pro quo for a good visit, have acted inappropriately. The mother’s outbursts, constant telephonic communication during visits and her explosive use of language and discord, which the court has actually heard by listening to voice mail messages she has left, are destructive.
The father faces numerous conflicts. As a professional his schedule changes. The life of a New York City police detective, like any other law enforcement official in this day and age, is not one which provides for continuity, regular days off the same day of the week, nor does it allow one the luxury of knowing what’s going to happen in a tumultuous world the next hour, the next day or the next month. Similarly, the child, growing in years, is entitled to a life outside that of both the mother and father but the child clearly here is so aligned with the mother that she does not really even have a social life separate and apart from the mother. Her life is to protect the mother from the overreaching father whose only way that he knows how to deal with the frustration of the events in front of him are to scream, yell and take charge.
Clearly, these parties have been involved in years of counseling and there are some reports that the father has previously disengaged relations with counselors or therapists, having had disputes with those counselors and having the belief that the *722 counselors were not effective. The child’s absences and latenesses in school, notwithstanding her being a member of the honor roll, provide the court with a view that the father’s concerns about the child’s well-being are not baseless.
The testimony of the maternal grandmother was both compelling and telling. Her testimony was one which exhibited protection of her daughter and granddaughter and her disdain for her son-in-law and her disappointment in her former son-in-law’s actions in dealing with both his ex-wife and the child. Her almost scolding nature as to how he conducted himself and the testimony regarding the events surrounding an honors awards night at school at the end of the child’s school semester was both disconcerting and certainly disappointing. An event which the family should remember fondly for years to come became one of tension, anger and loud disagreement, based in part upon the child’s interpretation that what she obtained for the father for Father’s Day was not acceptable to him and the poor communication between the parties that resulted therein.
These parties must learn how to control themselves. This court has heard tape recordings of messages left on the father’s cell phone which are both disgusting, shaky, clearly inappropriate and, if in fact the child has heard them, furthers her confusion and her belief that she needs to be aligned with her mother. These parties in the interest of their children must stop. The father must recognize that periods of visitation are for him and him alone, that his events and places which he takes this child to are important to him but that a teenager may not benefit from such visits with others. The court recognizes the father’s special role as a leader within the New York City Police Department. The court recognizes that when a police officer is unfortunately killed or injured in the line of duty the father’s responsibilities become greater and there is the need to cancel visitation, but clearly the events that are important to the father, such as including the child in Father’s Day celebrations with the fraternal organization, may not be in the child’s best interest when their relationship is in and of itself shaky.
There is no doubt that both of these parents love this child. This court does not truly believe that this father wants this court to discontinue his support obligation. He wants the terms and conditions in the stipulation of settlement relating to custody and visitation to be enforced.
The court looks with disfavor on the issue of holding a teenager in contempt of court for failure to visit with the father, *723 but the parties must recognize that if the father changes his relationship with this child and the way that he deals with this child, and the mother does not stop her dependency and involvement of this child, then the parties may place their financial arrangements in peril.
The mother herein describes a series of events where the father threatened her, acts of domestic violence during the marriage, utilization of weapons and a fear for her safety and well-being while at the same time she agreed to joint custody instead of a trial in the instant matter. These events as described predate the stipulation of settlement and judgment of divorce. The court is unable to discern whether or not the mother, as a victim of domestic violence, has hidden those events out of fear, shame or concern for her safety, nor can the court discern at the present time whether or not these are valid claims or fabrications. Neither attorney brought forth witnesses nor was there any proof adduced at trial other than the parties’ testimony as to these prior events which are of concern to this court.
It is clearly observable to this court that the father who has control over so many other lives as a highly respected detective with the New York City Police Department has very little control over his present life. The arrangements for visitation are certainly frustrating. The conduct of the infant issue here is predictable given the strife and pressures she has been placed under by both parents. The parties must recognize that she is a child, a child who needs their assistance, and not an active participant in the parties’ discord. If both parties do not stop what has been years in patterns of dealing with each other in the most destructive way, this child may grow up not wanting to have much to do with either of them or severely debilitated by her parents’ actions.
The Law
Domestic Relations Law § 241 provides that:
“When it appears to the satisfaction of the court that a custodial parent receiving alimony or maintenance pursuant to an order, judgment or decree of a court of competent jurisdiction has wrongfully interfered with or withheld visitation rights provided by such order, judgment or decree, the court, in its discretion, may suspend such payments or cancel any arrears that may have accrued during the time that visitation rights have been or are be *724 ing interfered with or withheld. Nothing in this section shall constitute a defense in any court to an application to enforce payment of child support or grounds for the cancellation of arrears for child support.”
The Second Department has held that:
“Domestic Relations Law § 241 provides that where a custodial parent, who receives maintenance or alimony pursuant to an order, judgment or decree has wrongfully interfered with or withheld visitation rights, ‘the court in its discretion, may suspend such payments or cancel any arrears that may have accrued during the time that visitation rights have been or are being interfered with or withheld’. The effect of this provision is that ‘the court may, but need not’ suspend maintenance payments (see, Scheinkman, Practice Commentary, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 241, at 730)” (Nir v Nir, 174 AD2d 657, 657-658 [2d Dept 1991]).
It cannot be said in the instant application that the testimony adduced at trial has shown that the mother’s conduct rose to a level of a deliberate frustration or an active interference with the father’s visitation rights that it would be an appropriate basis to eliminate the obligation of the father to pay maintenance (see Matter of Hecht v Hecht, 222 AD2d 589 [2d Dept 1995]).
“Where the custodial parent’s actions do not rise to the level of deliberate frustration of the noncustodial parent’s visitation rights, suspension or termination of support payments is not warranted” (Hiross v Hiross, 224 AD2d 662, 663 [2d Dept 1996] [internal quotation marks omitted]).
Nor can the court find as a result of the hearing that the mother herein by her actions or inaction solely “orchestrated and encouraged the estrangement of defendant from the children” (see Usack v Usack, 17 AD3d 736, 739 [3d Dept 2005]). Unlike Usack, the father herein bears some responsibility for the strained relationship with the child.
The child’s action regarding the issues of visitation cannot constitute an act of abandonment in that the father has an obligation to seriously maintain a relationship with the child (see Radin v Radin, 209 AD2d 396 [2d Dept 1994]). This father and the child have made attempts to see each other and there have been some successful, albeit nonovernight, visitations.
*725 What can be said is that there is the need for intensive therapeutic intervention necessary to assist these parties in halting their destructive behavior toward each other and themselves.
Professor Andrew Schepard of the Hofstra University School of Law has fostered the view that parenting coordinators in high conflict custody disputes should be encouraged (see Andrew Schepard, Parenting Coordinators for High-Conflict Parents, NYLJ, May 8, 2003, at 3, col 1).
In explaining the role of parenting coordinator, Schepard states:
“A parenting coordinator is a combination educator, mediator and sometimes-therapist who helps parents develop conflict-management skills and decides disputes if they cannot. A useful way to describe a parenting coordinator is to analogize the role to that of a trustee in bankruptcy. A bankruptcy trustee supervises the daily operations and the plans of a financially troubled business with the goal of restoring it to viability. Similarly, by supervising parenting and resolving conflict, a parenting coordinator helps high-conflict parents develop a tolerable working relationship (usually parallel as opposed to cooperative parenting) for the benefit of their children” (at 3, cols 1-2).
While the utilization of parenting coordinators has not been widespread in New York State, the concept has gained support on a wider scale. Professor Schepard noted:
“A parenting coordinator is, in essence, a broader version of the concept of special master or referee to high-conflict, repetitive-litigant parents. The role includes the power to mediate and educate as well as decide. The parenting coordinator concept has growing support nationally and in other states. As mentioned in my last column, in September 2000, the Family Law Section of the American Bar Association, and the Johnson Foundation sponsored an interdisciplinary conference (the Wingspread Conference) on high-conflict custody cases that designed an action plan for reforming the legal system for the benefit of children. One of its recommendations is that courts appoint ‘[p]arent monitors, coordinators, or masters who are professionals trained to manage chronic, recurring disputes, such *726 as visitation conflicts, and to help parents adhere to court orders’ to protect the children of such parents” (at 6, cols 1-2).
This court is cognizant of established precedent in this state that the court cannot and should not delegate its authority to, or condition future visitation on a recommendation of, a professional therapist or neutral evaluator (see Jordan v Jordan, 8 AD3d 444 [2d Dept 2004]; see also Matter of Grisanti v Grisanti, 4 AD3d 471 [2d Dept 2004]). The Second Department, though, has ruled that it is not an improper delegation of authority to appoint a case manager (see Zafran v Zafran, 306 AD2d 468 [2d Dept 2003]).
In a broader sense, this case brings forth the constraints that courts have in a modern society to be involved in the day-to-day disputes of parents, the role of a child alienated by both parents and the efficacy of eliminating or curtailing child support and maintenance.
The actions of the parties together have caused this child’s reluctance to visit the father and, at this juncture, because both parents have contributed to this serious situation, the court denies the father’s application to eliminate child support and maintenance.
Inasmuch as the child does wish to visit with the father, and the father’s acts are a major contributing factor to the lack of meaningful overnight visitation, there is no finding of abandonment warranting elimination of support (see Radin v Radin, 209 AD2d 396 [2d Dept 1994]), nor can it be said that the mother’s acts rise to the level of a deliberate frustration with visitation (see Weinreich v Weinreich, 184 AD2d 505 [2d Dept 1992]).
In order to assist reestablishing regular visitation pursuant to the stipulation and judgment, the court herein will take the unusual step of appointing a parenting coordinator. The purpose of the appointment of a parenting coordinator in the instant matter is to facilitate a reestablishment of parent-child visitation. The parenting coordinator will be the neutral individual who can verify that the child understands the importance of visitation, that limits and plans for the visitations can be discussed and the efficacy of plans or alternative plans to be coordinated. Visitation should be unhampered between parent and child, not based upon a quid pro quo, and changes to a schedule should not be encouraged. Parents have a right to know what time they are expected to assume their parenting *727 roles and what time is available for them to enjoy time alone. Similarly, the child should know when she will be with each parent and what she will be doing during visitation. This will provide her with a sense of regularity in the process. Visitation should not occur at the beginning of this process with other nonrelated adults present in the father’s home and the child should not be left in the care of others. Finally, the mother must assure the child that she is fine alone without her and that in fact she has made other plans and is not expecting the child to call and end each visitation early or before the scheduled time. Then, the parenting coordinator can be an accurate reporter of events leading up to visitations, plans and hopefully successful visits. The coordinator can act as a go-between for the parents and child to assure that there are open lines of communication. The parenting coordinator shall assist the parties in establishing regular visitation with the child, the ultimate goal being overnight parent-child time consistent with the stipulation, judgment and this decision. It is anticipated that the coordinator will meet with the parents and child biweekly at the beginning of the process, expanding to monthly, and hopefully assisting the parties and child in reestablishing meaningful parent time.
The application to enforce visitation is held in abeyance pending the adjourn date fixed herein. The parties shall each submit three names of a parenting coordinator with resumes within 14 days from this date unless they can agree on the coordinator.
Since both parties must be equally vested in the outcome and responsibility for their past acts, both parents shall equally pay for the costs of the parenting coordinator.
The court will hold the balance of the motion once the parenting coordinator has been assisting the parents and child for a period of six months, and the matter is calendared for March 24, 2006, at 9:30 a.m.
The application for counsel fees is denied. Here, where both parties bear responsibility for the child not visiting with the father, there is no basis to order one party to pay the other party’s fees.

. The mother credits this repaired relationship to the father’s payment of tuition, etc., for the son.